

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| **BILL and LACY HURSH,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**STATE FARM FIRE & CASUALTY COMPANY;**<br>**MARK D. WELTY;** and<br>**MARK D. WELTY INSURANCE AGENCY, INC.,**<br><br>*Defendants.* | **CASE NO. CJ-2025-2626**<br>**Hon. Amy Palumbo**<br>FILED IN DISTRICT COURT<br>OKLAHOMA COUNTY<br><br>**NOV 14 2025**<br><br>RICK WARREN<br>COURT CLERK<br>108 _____ |

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION**
**TO STATE FARM'S MOTIONS TO QUASH THE DEPOSITION NOTICES OF**
**THOMAS MOSS, NICOLE MANDUCA, SCOTT WELSH,**
**WENSLEY HERBERT, KATHY RESS, TYRONE SMITH, AND WENDY MAZZA**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD.......................................................................................... 2

III.  ARGUMENT AND AUTHORITIES ................................................................. 3

      A.    State Farm Claims Consultant Tom Moss Has Already
          Provided Relevant Testimony Regarding the Scheme in
          Another Matter.............................................................................................3

      B.    Wensley Herbert, Vice President of State Farm's P&CCD......................5

      C.    Scott Welsh, Director of Consulting Services ..........................................6

      D.    Nicole Manduca, Director of Operations and WHMET
          Leader ........................................................................................................8

      E.    Kathy Ress, Senior Vice President of Operations ...................................10

      F.    Wendy Mazza and Tyrone Smith, Retired Vice Presidents
          of Operations.............................................................................................11

      G.    State Farm's Attempt to Limit Discovery through an
          "Apex" Doctrine Fails..............................................................................11

IV.   CONCLUSION AND REQUEST FOR RELIEF............................................. 13

## TABLE OF EXHIBITS

**EXHIBIT 1 Hereto:**    Plaintiffs' Response to State Farm's Motion to Quash Deposition
of Wensley Herbert
*Nida v. State Farm*, CJ-2020-4453
(Okla. Cty., Okla. Apr. 15, 2024)

**EXHIBIT 2 Hereto:**    Plaintiffs' Response to State Farm's Motion to Quash Deposition
of Scott Welsh,
*Nida v. State Farm*, CJ-2020-4453
(Okla. Cty., Okla. Apr. 15, 2024))

**EXHIBIT 3 Hereto:**    State Farm's Motion to Quash
*Cisneros v. State Farm*, 5:25-cv-00042-R
(W.D. Okla. Nov. 11, 2025) (Doc. No. 43-2)

**EXHIBIT 4 Hereto:**    Plaintiffs' Motion to Compel
*Lyle v. State Farm et al.*, CJ-2024-183
(Cleveland Cnty., February 13, 2025)

**EXHIBIT 5 Hereto:**    Order on Plaintiffs' Motion to Compel
*Lyle v. State Farm et al.*, CJ-2024-183
(Cleveland Cnty., April 7, 2025)

**EXHIBIT 6 Hereto:**    Plaintiffs' Challenges to State Farm's Privilege Log and Request
for In Camera Review
*Nida v. State Farm*, CJ-2020-4453
(Okla. Cty. Okla Jun 21, 2024)

ii

## I.    INTRODUCTION

State Farm's Motions[1] advance an array of improper objections and arguments in its continued attempt to shield its fraudulent Scheme from sunlight.

Plaintiffs alleged a broad-reaching Scheme on State Farm's part to pre-deny wind and hail damage claims warranting total roof replacements. The Scheme is the work product of State Farm's Property and Casualty Claims Department ("P&CCD"). P&CCD identified roof indemnity as State Farm's largest source of indemnity losses. It then issued a memorandum identifying that State Farm was overpaying "roof spend" (*i.e.*, indemnity payments under homeowners insurance policies for damage to roofs).

> P&C Claims is focusing on what we can do *to lower our indemnity payments related to Roofs*. Last year we had an indemnity over $3.5 Billion dollars and a total of $16.6 Billion over the last 7 years for the Enterprise on roofing.

*See* Plaintiff's Motion to Enforce Discovery Order of November 23, 2021 and Motion for Sanctions, *Barnett v. State Farm*, CJ-2020-141 (Grady Co. Okla. April 8, 2024)[2] (citing Aug. 2, 2022 Hrg. Tr. at 108:25-109:4 with emphasis added). *Barnett* addressed the same Scheme at issue here.

---

[1] Plaintiffs respond here to each of the following "Motions":
  (1) Defendant State Farm Fire and Casualty Company's Motion for a Protective Order and to Quash and/or Stay Plaintiffs' Deposition Notice of **Kathy Ress** (10-24-2025);
  (2) Motion For Protective Order and to Quash and/or Stay [Deposition of **Nicole Manduca**] (10-27-2025);
  (3) Motion For Protective Order and to Quash/Stay Plaintiffs' Deposition Notice of **Scott Welsh** (10-28-2025);
  (4) Defendant State Farm and Casualty Motion for a Protective Order and to Quash/Stay Plaintiffs' Deposition Notice of **Thomas Moss** (10-29-2025);
  (5) Defendant State Farm Fire and Casualty Company's Motion for a Protective Order and to Quash/Stay Plaintiffs' Deposition Notice of **Tyrone Smith** (10-30-2025);
  (6) Defendant State Farm Fire and Casualty Company's Motion for Protective Order and to Quash/Stay Plaintiffs' Deposition Notice of **Wendy Mazza** (10-31-2025); and
  (7) Motion For Protective Order and to Quash/Stay Plaintiffs' Deposition Notice of **Wensley Herbert** (11-03-2025);

[2] This is attached to Plaintiff's Motion to Compel as Exhibit 3. As it is voluminous, it has not been reproduced here, but can be furnished if the Court so wishes.

State Farm's P&CCD followed with an investigation into initiatives to reduce indemnity payments on roof claims and pad its bottom line.

To achieve its desired ends, State Farm concocted its "Wind/Hail Fire Model Enhancement Program" and created its Wind & Hail Fire Model Enhancement Team ("WHMET"). The WHMET served to develop, implement, monitor, and assess the Scheme. The WHMET is a star chamber consisting of approximately ten internal State Farm property claims experts charged with executing the Wind/Hail Initiative. Nicole Manduca was the leader of the WHMET.[3] The architects of the Scheme served on State Farm's WHMET.

The WHMET developed the "Wind/Hail Playbook," a menu of training items intended to alter State Farm's approach to handling wind/hail claims. The tactics within the playbook included removing an individual adjuster's authority to total a roof without prerequisite managerial approval, mandatory wind/hail identification training provided by the consulting firm HAAG, "enhanced claims handling hygiene," and training on the "art of the conversation" for claims handlers. *See* Plaintiffs' Response to State Farm's Motion to Quash Deposition of Wensley Herbert, *Nida v. State Farm*, CJ-2020-4453 (Okla. Cty., Okla. Apr. 15, 2024), at 2-3 (attached hereto as Exhibit 1).

Plaintiffs noticed the depositions of key WHMET members and Scheme architects:

- **Thomas Moss**, *Claims Consultant and WHMET Member*
- **Wensley Herbert**, *Vice President of State Farm's P&CCD*
- **Nicole Manduca**, *WHMET Leader*
- **Scott Welsh**, *Director of Claims Consulting*
- **Kathy Ress**, *Vice President of Operations*
- **Wendy Mazza**, *Vice President of Operations*
- **Tyrone Smith**, *Vice President of Operations*

---

[3] A copy of Manduca's deposition taken in April 2024 along with exhibits was recently ordered to be produced by Judge Virgin in Cleveland County, State of Oklahoma, Case No. CJ-2024-183, *Lyle v. State Farm*. In *Nida v. State Farm*, CJ-2020-4453, State Farm produced a privilege log with multiple emails involving Manduca and the draft of the Wind/Hail playbook with in-house counsel. *See Nida Plaintiffs' Challenge to State Farm's Privilege Log and Request for In Camera Review filed June 21, 2024.*

(collectively, the "Noticed Deponents"). In response, State Farm filed motions for protective orders from, to quash, and/or to stay each noticed deposition (State Farm's "Motions"). State Farm's Motions rehash once again its tired attempt to misdirect the Court away from its Scheme and paint Plaintiffs' Petion as a single, isolated claim dispute. Simply, State Farm's insistence that Noticed Deponents had nothing to do with the adjustment of Plaintiffs' Claim is both false and misleading. While it is true Plaintiffs do not allege the Noticed Deponents performed specific adjusting tasks on Plaintiffs' Claim, each Noticed Deponent contributed to the concoction of State Farm's Scheme that resulted in the denial of Plaintiffs' claim. *See, e.g.*, Pet. ¶¶ 4, 25-40. Each is responsible for key aspects of the Scheme's origin, development, and/or implementation. And, because the denial of Plaintiffs' claim is a direct result of the Scheme, each had plenty to do with Plaintiffs' harm to warrant the taking of their deposition in this matter.

A collective read of the Motions shows State Farm's frustration with the order of discovery. But State Farm cites no Oklahoma law requiring Plaintiffs to start from the bottom and work their way up the State Farm corporate ladder in the face of plainly relevant information on the part of each Noticed Deponent.

Each Noticed Deponent was directly and materially involved in State Farm's reduction of indemnity payments relating to roof claims, implementation of claims handling "tactics" in pursuit of paying less on wind/hail claims, and tracking of its precipitous decrease in roof payments as a result of those tactics. *See, e.g.*, Pet. ¶¶ 4, 34-39. State Farm has no right to dictate the order in which Plaintiffs notice relevant depositions in this matter.

Nevertheless, State Farm advances a tired, myopic view of Plaintiffs' lawsuit in demanding these depositions be off-limits or delayed. It flippantly insists that any inquiry beyond the four-corners of an individual claim file is equal parts irrelevant and impermissible. Plaintiffs have

alleged, and the Court has well-understood, a pervasive weaponization of State Farm's claims department to the detriment of its insureds. *See id.* The Noticed Deponents were charged with responsibility for State Farm's Scheme. They can answer for it.

## II.    LEGAL STANDARD

Discovery is intentionally broad. liberal discovery will minimize the possibility of bad faith litigation, stating "the strongest argument against discovery is more one of tactics, than of actual prejudice." *Tuller v. Shallcross*, 1994 OK 133, ¶10, 886 P.2d 481,484. The crux of State Farm's objections hinge largely upon its unilateral opinions of what is relevant to the needs of this case. But proportionality has nothing to do with the policy limits or State Farm's unilateral opinions on the value of the claim. An action in bad faith is not confined to the four-corners of the insurance claim. As the Oklahoma Supreme Court has stated, "the essence [ of a bad faith cause of action] is the failure to deal fairly and in good faith with an insured as such, the jury may be shown the entire course of contact between the parties." *Timmons v. World Globe*, 1982 OK 97, ¶18, 653 P.2d 907, 917. Relevance is broadly defined, and evidence need not be admissible to be relevant and discoverable. *See* 12 O.S. §3226(B)(l)(a); *see also Scott v. Peterson*, 2005 OK 84, ¶6, 126 P.3d 1232, 1234; *Reibert v. CSAA Fire & Cas. Ins. Co*, 2018 WL 279348 (N.D. Okla. Jan. 3, 2018) at *3 & 6 (N.D. Okla. Jan. 3, 2018).

"Irrelevancy" is not an enumerated ground for a protective order under § 3226(C), and it is insufficient to simply recite boilerplate objections such as overbroad, burdensome, oppressive or irrelevant. *Reibert, supra*. Rather, State Farm must demonstrate specific facts to warrant a protective order. *Crest Infiniti, II, LP v. Swinton*, 2007 OK 77, ¶ 17, 174 P.3d 996, 1004; *YWCA of Oklahoma City v. Melson*, 1997 OK 81, ¶ 15, 944 P.2d 304, 308-09. Accordingly, "[i]f the basis for an objection is lack of relevance, 'the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery is of such marginal relevance

2

that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.' " *Fed. Ins. Co. v. Indeck Power Equip. Co.*, 2016 WL 5173402, at *2 (W.D. Okla. Sept. 21, 2016) (citation omitted).

## III.    ARGUMENT AND AUTHORITIES

### A.    State Farm Claims Consultant Tom Moss Has Already Provided Relevant Testimony Regarding the Scheme in Another Matter.

In *Barnett v. State Farm*, Case No. CJ-20-141 (Grady County, Oklahoma), State Farm Claims Consultant Tom Moss testified to the existence of WHMET, of which Moss was a member. Plaintiff's Motion to Enforce Discovery Order of November 23, 2021 and Motion for Sanctions, *Barnett v. State Farm*, CJ-2020-141 (Grady Co. Okla. April 8, 2024)[4], at pp. 6-8. Moss testified as to a recommendation issued to all State Farm claims handling personnel affecting their ability to issue payment for a total roof replacement without prior managerial approval. *See id.*

Moss testified to additional recommendations and initiatives of the WHMET affecting the handling of wind/hail and roof claims, including:

- Issuing a recommendation regarding common findings regarding roof damage estimates and State Farm's use of Xactimate;
- Instituting a procedure for hail claims requiring management review when weather reports showed hail size was 1 inch or less;
- Instituting a procedure for wind claims requiring management approval of claim payments for roofs where reported wind speeds were 50 miles an hour or less.
- Requiring all wind/hail claims to include an AccuWeather report in the claim file to determine hail size on the reported date of loss.
- Recommending the use of HAAG training for all claims handlers working wind/hail claims.
- Reviewing claim files, survey results, and re inspection results for opportunities to retrain Claims Handling Personnel.

*See id.* Moss further testified that the WHMET worked with State Farm's Enterprise Technology division to create rules within State Farm's Xactware software deployments. *Id.* at 10. These

---

[4] This is attached to Plaintiff's Motion to Compel as Exhibit 3. As it is voluminous, it has not been reproduced here, but can be furnished if the Court so wishes.

enterprise-wide rules apply to all State Farm estimates from all State Farm Claims Handling Personnel. These rules act as triggers within the software which notify the claim handler when certain actions are taken or recommended—e.g., the attempted indemnification of an insured for a total roof replacement. State Farm uses these rules to accomplish pre-determined objectives, including available settings within Xactimate that tie back to State Farm's claims training. State Farm's claim consultants, including its Enhancement Team, worked with contacts within State Farm's Enterprise Technology division, including Chris Bauer, to communicate the changes and settings it sought to implement within State Farm's version of its claims software. *See id.*

Ultimately, the WHMET served to identify "what the potential opportunities were for [State Farm] to improve in [handling wind/hail] claims." *Id.* at 167:22 - 169:3. While State Farm uses euphemisms like "quality" and "opportunity" to describe the pursuits of its Enhancement program, its internal documents decode the true meaning of these terms: paying for fewer roof replacements. Indeed, as it enacted the recommendations of the Wind Hail Enhancement program, the measurement by which State Farm measured these new tactics was consistent-a decrease in full roof replacements for its policyholders.

Moss testified as to the existence of State Farm's "quality plans," which State Farm's Claim Consultants develop to help Claims Handling Personnel operate in commitment with State Farm's expectations. *See id.* Moss confirmed State Farm's Consultants work with other Claims Handling Personnel within their respective divisions to develop and share these plans and that, typically, the plans are prepared annually. *See id.* In his experience, Moss first recalled working to develop a quality plan in 2018. *See id.* State Farm's quality plans are published and made available to its claims personnel via its internal intranet. *See id.* Among other things, State Farm's quality plan for

wind and hail claims outlines the training requirements for relevant Claims Handling Personnel. *See id.*

Moss specifically testified that any WHMET recommendations that were implemented would have been communicated to State Farm Claims Handling Personnel through a guideline document available at that time on the State Farm intranet. These recommendations were codified as State Farm's "Wind/Hail Playbook." *See id.*

Moss identified the following key WHMET stakeholders: Nicole Manduca, *WHMET Leader*, Tom Moss, *Claims Consultant*, Wensley Herbert, *Senior Vice President of Claims*, and Scott Welsh, *Director of Consulting Services*. *See id.*

## B.  Wensley Herbert, Vice President of State Farm's P&CCD

Wensley Herbert is State Farm's Vice President overseeing its Property and Casualty Claims Division ("P&CCD"). He is the *highest-ranking* individual in charge of claims at State Farm and maintains overall responsibility for the State Farm claims operation. Each of the other Noticed Deponents serving in a Vice President role—Rees, Mazza, and Smith—reported directly to Herbert. And indeed, it is State Farm's claims operation-and its crusade to lower indemnity payments on wind/hail claims-that led to the instant deposition notice.

Plaintiffs ask the Court to take notice of the statements in State Farm's Motions that exemplify the way State Farm is abusing its discovery obligations and misdirecting this Court. For example:

> Thus, there can be no explanation for demanding Mr. Herbert's deposition other than to harass and burden State Farm into producing a senior executive for a deposition that Plaintiffs know will lead to nothing relating to their allegations concerning State Farm's handling of their claim.

*See* Motion to Quash Hebert Deposition at 2. State Farm knows this is both false and misleading.

Motion practice in the *Nida* case makes clear the extent to which Herbert was driving the Scheme forward, demanding updates, and focusing on its impact on State Farm's bottom line. *See* Exhibit 1 hereto (Plaintiffs' Response to State Farm's Motion to Quash Deposition of Wensley Herbert, *Nida v. State Farm*, CJ-2020-4453 (Okla. Cty., Okla. Apr. 15, 2024)), at 3-4 (with citations to documents produced in *Hosier v. State Farm*, redacted): "Herbert was not satisfied. In June of 2021, he specifically complained his claims department was 'not making improvements fast enough'". In fact, the briefing shows Herbert's influence led directly to the Quality Plans at issue in Plaintiffs' discovery Motions to Compel.

> In response to Herbert's request for "next steps," his subordinates provided him the "Fire Claim Quality" plan, which noted the need to stop paying for purportedly "non-covered roof damage," and reported on the Fire Model Enhancement program's tactics. *See* J. Taylor Depo., Kyger (Feb. 28, 2024), at 159:18-182:13.2 Thus, Herbert was responsible for the Claims Department and had personal knowledge of State Farm's indemnity-reducing tactics. State Farm monitored the "improvements" Herbert sought to expedite with one metric: the reduction of full roof replacements paid to State Farm's insureds.

*See* Exhibit 1 hereto at 5-6.

## C.     Scott Welsh, Director of Consulting Services

Scott Welsh is State Farm's Director of Consulting Services. Welsh manages State Farm's "Claims Consultants," a limited task force of high-ranking claims handlers with authority over the handling of claims in their respective jurisdictions. Not only do Welsh's claims consultants affect and implement policy in their region, but many served on State Farm's WHMET.

Even more critically, Welsh *personally* recommended the use of HAAG training for all State Farm homeowners claim handlers. State Farm produced a corporate representative regarding its use of HAAG, Jason Taylor, in *Nida v. State Farm*. See Exhibit 2 hereto (Plaintiffs' Response to State Farm's Motion to Quash Deposition of Scott Welsh, *Nida v. State Farm*, CJ-2020-4453 (Okla. Cty., Okla. Apr. 15, 2024)). Taylor testified that Welsh was the most senior individual at

State Farm involved in the decision to retain and approve the use of HAAG training, despite State Farm's nationwide moratorium against the use of HAAG Engineering services. *See* Exhibit 2 hereto (citing Taylor Depo.). Briefing in the *Nida* State Farm Scheme case explained Welsh is key State Farm employee with understanding of State Farm's decision to require HAAG training despite its moratorium on the use of HAAG following a jury verdict and multiple governmental investigations into HAAG's bias against State Farm's insureds.[5] Welsh's deposition is therefore relevant to Plaintiffs' allegations of institutional bad faith, and the Court should allow the same to proceed.

Testimony from other Scheme-focused cases confirmed Welsh worked with members of State Farm's WHMET (who were, in turn, Claims Consultants under Welsh's supervision) on approving and implementing State Farm's decision to require HAAG training of its claims personnel.

> [T]he approval that I received came from who I reported to at that time, and that was director Scott Welsh. So, I worked with Scott on what this recommendation was, received approval, and we implemented or worked with Claims Training for them to pull in that training, make it available.

*See* Exhibit 2 hereto at 5-6 (citing Deposition of Tom Moss, *Barnett v. State Farm*, Aug. 17, 2023, at 151:5 - 152:22). Welsh's responsibility for State Farm's use of HAAG is borne out through the documents the Court compelled State Farm to produce in that case. Briefing suggests those documents "show Welsh initiating the process to retain HAAG" Exhibit 2 hereto at 5-6 (citing specific bates numbered documents produced in *Hosier*).

Briefing further suggests Welsh coordinated State Farm's pilot program to test its implementation of HAAG training.

---

[5] This topic is of particular inquiry throughout Plaintiffs' Discovery Requests and was compelled in prior Scheme-focused cases. *See* Plaintiffs' First Motion to Compel (Oct. 8, 2025), at 10-12.

> Following that pilot, Welsh received a report explaining supposed improvement in claims handling *"quality"*—the report demonstrated a consistent reduction in estimated roof 6 damage. *Id.* at 344:5 - 347:18. Welsh's possesses personal knowledge regarding State Farm's decision to use *HAAG*. Moreover, he appears to be the only individual qualified to answer why State Farm would continue its association with HAAG despite its moratorium.
>
> * * *
>
> Indeed, Welsh is responsible for the coordination of State Farm's annual Fire *Quality Plans*, which incorporate the recommendations of its Enhancement Team and outline new and additional steps the company intends to implement in the handling of claims. In one of many such emails, Welsh set forth the path to compile and implement one of these Quality Plans[.]
>
> * * *
>
> Welsh additionally hosted smaller meetings with more senior claims personnel to discuss potential *"enhancements"* to be made in State Farm's claims processes[.]

Exhibit 2 hereto (citing Deposition of Jason Taylor at 296:12-297:22) (emphasis added). This knowledge is particularized to Welsh's supervisory role as the Director of Consulting Services. State Farm's decisions to *study, recommend, and implement institutional changes* to its handling of hail claims is relevant and discoverable.

**D.     Nicole Manduca, Director of Operations and WHMET Leader**

Nicole Manduca is the Senior Leader/Director of Operations at State Farm. Moss identified Manduca as *the leader* of the WHMET. This role alone warrants her deposition in this matter. Yet State Farm has demonstrated a consistent and relentless attempt to keep her from testifying in Scheme-focused cases.

In fact, Manduca entered a declaration earlier this month in *Cisneros v. State Farm* (yet another Scheme-focused case where Manduca's conduct is at issue. *See* State Farm's Motion to Quash, *Cisneros v. State Farm*, 5:25-cv-00042-R (W.D. Okla. Nov. 11, 2025) (Doc. No. 43-2) (attached hereto as Exhibit 3 hereto). Her declaration—which effectively pleads "nothing I did was wrong"—confirms her involvement in the Scheme Plaintiffs pled, demonstrates the relevancy of her testimony, and emphasizes Plaintiffs' right to tests that insistence through deposition. State

Farm may not insulate itself from deposition-based discovery through such declarations of non-liability. As the Northern District of Illinois pointedly stated:

> A party has a general right to compel any person to appear at a deposition, through issuance of a subpoena if necessary. .... Non-parties are not exempt from the basic obligation of all citizens to provide evidence of which they are capable upon appropriate request. ... Or as Wigmore phrased it: "the public...has a right to every man's [and every woman's] evidence."... If the answers to the questions posed to Ms. Moore at her deposition are truly beyond her knowledge, "I don't know" is not a forbidden response. Indeed, it is appropriate. If she truly does not have access or knowledge regarding the whereabouts of the requested documents, she can say so at her deposition. ***But, she cannot simply avoid complying with the subpoena altogether by alleging in a motion to quash that a deposition would be a pointless event since she is without any relevant knowledge.***

*Reed v. Illinois*, 318 F.R.D. 77, 81 (N.D. Ill. 2016)(emphasis added, internal citations omitted).

Nonetheless, briefing in similar Scheme-focused cases indicates the existence of dozens of Manduca-authored documents that note the direct relationship between State Farm's stated goal of improving claim handling "quality" and its actual tangible impact: denying policyholders' claims. Similarly, State Farm produced a lengthy privilege log in *Nida v. State Farm*, CJ-2020-4453, (Okla. Cty. Okla. June 21, 2024) in which Manduca's name was referenced in numerous documents that State Farm did not want to produce. *See* Plaintiffs' Motion to Compel, *Lyle v. State Farm et al.*, CJ-2024-183 (Cleveland Cnty., April 7, 2025) (attached hereto as Exhibit 4 hereto) at 11-12.

Indeed, Manduca was eventually deposed in *Nida*. Briefing in that matter reinforces the relevancy of her testimony here. For example,

> Ms. Manduca served as the head of State Farm's FME program-a program through which State Farm explicitly set out to reduce the number of full roof replacements it covered. During her deposition, Ms. Manduca was questioned about a document relating to State Farm's Fire Accuracy Dashboard-a webpage through which it regularly monitored the number of full roof replacements its Team Managers authorized to be paid. On this email· chain, Tom Moss, a State Farm Claims Consultant on the FME program, mentioned his concern that the dashboard "may

give the appearance we have a target number" of full roof replacements and may affect "how others outside of the company try to characterize the metric."

*Plaintiffs' Challenges to State Farm's Privilege Log and Request for In Camera Review, Nida v. State Farm*, CJ-2020-4453 (Okla. Cty. Okla Jun 21, 2024) (attached hereto as Exhibit 6 hereto), at 9-10.

The plaintiffs in *Lyle v. State Farm* filed a Motion to Compel production of Manduca's deposition transcript from the *Nida* matter. *See* Exhibit 4 hereto (*Lyle* Motion to Compel) requesting Production of RFP 28, which requests the Nida Manduca deposition transcript). On April 7, 2025, Judge Virgin signed an order compelling production of the Manduca transcript. *See* Exhibit 5 hereto (Order on Plaintiffs' Motion to Compel in *Lyle v. State Farm et al.*, CJ-2024-183 (Cleveland Cnty., April 7, 2025)), at ¶ 5 (ordering State Farm to produce the same deposition transcript and exhibits attached thereto). This Court should apply the same approach—one that emphasizes the importance of discovery—and deny State Farm's Motion.

**E.     Kathy Ress, Senior Vice President of Operations**

Kathy Ress served as State Farm's Vice President of Operations at the inception of the WHMET. Ress served as Manduca's team leader and asked Manduca to head the WHMET Team. Ress and Manduca discussed various aspects of the WHMET team, opportunities for lowering indemnity, and related Scheme issues. Ress was directly involved in the reporting, development, and success of the WHMET team, including specifically comparing State Farm's success rates with the success of the WHMET in lowering full roof replacement percentages.

Ress took particular interest in comparing State Farm's baseline progress in 2021—from February of 2021 to November the same year, full roof replacement approvals from management dropped from 70.4% to 34.7% on wind/hail claims. *See* Exhibit 1 hereto.

10

**F.      Wendy Mazza and Tyrone Smith, Retired Vice Presidents of Operations**

Wendy Mazza is a retired Vice President of Operations for Claims. Tyrone Smith is a retired Vice President of Operations who spent his entire career with State Farm. Plaintiffs acknowledge Mazza and Smith are retired from their employment with State Farm and Plaintiffs have offered to reissue their deposition under subpoena. However, given State Farm's propensity to resist all of Plaintiffs' discovery to date, Plaintiffs respectfully request the Court determine the relevancy of said depositions now to avoid further delay. To that extent, Plaintiffs state that relevance here.

Wendy Mazza retired after thirty-three years working for State Farm. At the onset of the WHMET, Manduca directly reported to Mazza. Mazza was directly involved in reporting, monitoring, supervising, reviewing, and implementing the WHMET objectives. Mazza reviewed and analyzed WHMET presentations and reports. Mazza directly communicated with Ress regarding the growing number of customer complaints and worked on addressing rising complaints from State Farm insureds as State Farm implemented its Scheme to drastically reduce the number of full roof replacements on wind/hail claims.

Tyrone Smith is a retired Vice President of Operations who spent his entire career with State Farm. Manduca directly reported to Smith after Mazza. Like Mazza, Smith was directly involved in reporting, monitoring, supervising, reviewing, and implanting the WHMET objectives. Smith, like Mazza, reviewed and analyzed WHMET presentations and reports.

Like the other Noticed Deponents, Mazza and Smith are architects of the Scheme and their deposition testimony is directly relevant to this matter

**G.      State Farm's Attempt to Limit Discovery through an "Apex" Doctrine Fails.**

The Oklahoma Supreme Court has plainly "decline[d] to adopt the apex doctrine." *Crest Infiniti, II, LP v. Swinton*, 2007 OK 77, ¶ 17. Specifically, the Court refused to adopt the doctrine because it would "shift[] [the] burden to the party seeking discovery" in contradiction to both the

11

spirit and letter of Oklahoma's Discovery Code. *Id.* Thus, whether Plaintiffs have yet deposed low-level adjusters or claims handlers involved in Plaintiffs' case has no effect on Plaintiffs' ability to depose the architects of State Farm's Scheme.

State Farm "should not be allowed to rely solely on the blanket statement that these witnesses lack any information relevant to the issues in this case." *Crest Infiniti, II, LP*, 2007 OK 77 at ¶ 18. Oklahoma law is clear that this high burden is on State Farm, not Plaintiffs:

> We agree that petitioners must show more than these blanket statements to satisfy their burden for a protective order. Petitioners did not explain why the corporate official, as such, would not have knowledge of information relating to plaintiffs' causes of action. They did not explain why the particular information sought by plaintiffs would inflict annoyance, harassment, embarrassment, oppression or undue delay, burden or expense sufficient for issuance of a protective order when that information was sought from this particular individual. Petitioners did not explain and identify [. . .] the more appropriate corporate official to provide the information sought by plaintiffs.

*Id.*; *see also Reed v. Illinois*, 318 F.R.D. 77, 81 (N.D. Ill. 2016).

Even federal courts that may otherwise follow the apex doctrine recognize "[w]hen a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *Apple Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012); *see also Gauthier v. Union Pac. 13 R. Co.*, 2008 WL 2467016, at *3 (E.D. Tex. June 18, 2008) ("[f]ederal courts have, in fact, permitted the depositions of high-level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case").

State Farm has provided nothing to substantiate any Noticed Deponent's supposed lack of relevant knowledge beyond its usual unsupported rhetoric. In fact, each of the Noticed Deponents has specific knowledge of the Scheme at issue, which has been demonstrated and outlined in prior cases, public record, and deposition testimony. State Farm cannot approach its burden, especially when Plaintiffs have demonstrated each deponent's personal knowledge and relevance.

Further, State Farm has failed to articulate any need for a stay in this matter. Its attempts to suggest a stay is warranted constitute an impermissible attempt to control the order and pace of Plaintiffs' discovery. A stay will only serve to delay this matter while State Farm looks for more ways to avoid it discovery obligations. This is yet another tactic by State Farm to deny, delay, and deflect at any cost.

### IV. CONCLUSION AND REQUEST FOR RELIEF

Plaintiffs respectfully request the Court deny State Farm's Motions regarding Thomas Moss, Wensley Herbert, Scott Welsh, Nicole Manduca, and Kathy Ress.

Plaintiffs further request the Court find the testimony of Tyrone Smith and Wendy Mazza to be relevant hereto, thereby avoiding the need for further briefing upon Plaintiffs' re-structuring of those depositions under subpoena power.

Respectfully submitted,

*Michael Burrage*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Blake Sonne, OBA No. 20341
Hannah Whitten, OBA No. 35261
John S. Sanders, OBA No. 34990
Jake Denne, OBA No. 35097
**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Office: 405.516.7800
Facsimile: 405.516.7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
bsonne@whittenburragelaw.com
hwhitten@whittenburragelaw.com
jsanders@whittenburragelaw.com
jdenne@whittenburragelaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2025, a true and correct copy of the foregoing document was delivered, via first class mail and electronic mail, to the following interested parties:

Lance E. Leffel
Ashlyn M. Smith
GABLE GOTWALS
BOK Park Plaza
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
lleffel@gablelaw.com
asmith@gablelaw.com

Carrie B. McNeer
Grant A. Fitz
GABLE GOTW ALS
110 N. Elgin Avenue
Suite 200
Tulsa, OK 74120-1490
cmcneer@gablelaw.com
gfitz@gablelaw.com

*Michael Burrage*